**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-CV-2746

XANTERRA SOUTH RIM, L.L.C.,

                Plaintiff,

v.

SALLY JEWELL, Secretary of the Interior,
UNITED STATES DEPARTMENT OF THE INTERIOR,
JONATHAN JARVIS, Director of the National Park Service,
SUE MASICA, Regional Director, Intermountain Region, National Park Service, and
UNITED STATES NATIONAL PARK SERVICE,

                Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### INTRODUCTION

The National Park Service's ("NPS's") arbitrary and capricious actions threaten operations at one of the crown jewels of America's national park system, the South Rim of Grand Canyon National Park (the "Park"). Xanterra currently operates most of the lodging and other concessions at the Park, including El Tovar Hotel, Phantom Ranch, and Bright Angel Lodge and Cabins. NPS has so seriously mismanaged efforts to award two new concession contracts to provide lodging, dining and other services that Park visitors may arrive in January 2015 (when Xanterra's contract terminates) to find many of the Park's iconic facilities shuttered.

Concession contracts must, by statute, afford concessioners a "reasonable opportunity for net profit in relation to capital invested and the obligations of the contract." 16 U.S.C. § 5956(a). NPS has long relied upon concession contractors to fund significant capital projects, such as

building or improving visitor lodging facilities or other essential structures.  NPS also requires that concessioners provide adequate employee housing which traditionally has been inside the Park.   For well over a century, NPS has managed to achieve a fair balance, allowing concessioners to make a net profit while requiring private investment in the Park.  This is no longer the case.

In its recent efforts to award follow-on concession contracts at the Park, NPS arbitrarily decided that a large percentage of the concessioner's employees, many of whom have worked and lived for decades in the Park, cannot remain in their homes.  NPS's decision will result in the eviction of up to 224 employees and their families.  And these people, all of whom are critical to operation of the Park's lodges, restaurants, and other guest services, have no place to go.  NPS's unhelpful suggestion is that displaced employees find work with another concessioner or triple-bunk in small, uninsulated cabins normally closed during the winter months.  Even if displaced employees volunteered to live in such conditions, there would not be enough room to house them all.

This dire situation is all the more arbitrary and capricious because NPS could have easily avoided it.  Most of the lost housing was assigned to the smaller of the two new Park concession contracts where it is not needed.  Yet, NPS failed to implement the obvious solution of reallocating the housing.  The result:  No companies, not even incumbent Xanterra, submitted a bid for the larger of two concession contracts.

NPS has reopened the competition for the larger concession contract, with proposals now due on October 8, 2014, but it inexplicably has not fixed the housing misallocation.  Even if there were time to make alternative off-Park living arrangements by the revised February 1, 2015

start of the new larger concession contract—which there is not—the impracticality and high cost of relocating these people 70-miles away in Flagstaff, Arizona or spending upwards of $20 million to buy expensive land and build new facilities immediately outside the Park converts any concession contract into an untenable, money-losing proposition.

The impossible economics are guaranteed by NPS's drastic hike in the minimum franchise fees that must be paid to NPS for operating the Park's guest facilities.  The severe increase in the franchise fees, which comes off-the-top of the concessioner's gross receipts for the contract, resulted from another arbitrary and capricious NPS decision announced when it reopened the competition.  NPS stated it will use $25 million in Park funds and another $75 million borrowed from *other* national parks to "buy down" Xanterra's leasehold surrender interest ("LSI") in Grand Canyon landmarks and other facilities that Xanterra constructed in the Park during its 110-year tenure as the incumbent concessioner.  The LSI buy down did nothing to solve the housing problem.  It was not requested nor welcomed by Xanterra.  And, in order to pay for this $100 million expenditure, NPS more than *tripled* the franchise fee from the current rate of 3.8% to an astounding *minimum* fee of 14%.  By Xanterra's calculation, this results in a cumulative negative cash flow over the entire fifteen-year contract.  This ill-considered plan means that any resulting contract *still* will fail to provide concessioners with the statutorily-required "reasonable opportunity for net profit."

To make matters worse, draining $100 million from the national park system to facilitate this "buy down," by NPS's own admission, will result in layoffs and hiring freezes involving NPS's own employees and drastic reductions in guest services at numerous parks across the nation.  On top of that, NPS has announced yet another consequence of its arbitrary and unlawful

decisions: the need to raise entrance fees charged by NPS that the public must pay when visiting parks across the United States. The harm to the public is clear, but this increase in fees also will hurt the concessioners by reducing the amounts spent on other amenities, further reducing the likelihood of eking out a net profit. Thus, NPS's actions not only violate the law, they are a model of government mismanagement and impose heavy collateral damage on everyone associated with the national parks.

Xanterra's repeated requests that NPS address this situation have fallen on deaf ears. With concession proposals due on October 8, 2014, Xanterra is left with no alternative but to file suit against NPS.

This complaint against Sally Jewell (Secretary of the Interior), the United States Department of the Interior, Jonathan Jarvis (Director of NPS), Sue Masica (Regional Director of the Intermountain Region of NPS), and NPS (collectively, "Defendants") seeks (1) a declaratory judgment that the requirements contained in Defendants' concession contract prospectuses involving the provision of lodging, food and beverage, retail, transportation, and other services at Grand Canyon National Park from January 1, 2015 through December 31, 2029, are arbitrary, capricious, and in violation of law, and (2) a permanent injunction prohibiting further action in the solicitation process pending amendments to the prospectuses to bring them into compliance with the law. This injunction must extend to the award of both concession contracts to preserve meaningful relief as to allocation of employee housing now arbitrarily apportioned between the contracts.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question).  This Court may issue the requested relief under 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief).

2.      The Plaintiff's challenges against NPS's actions are properly brought under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701 *et seq.*, because NPS's actions are arbitrary and capricious conduct and in violation of the National Park Service Organic Act ("NPS Act"), 16 U.S.C. §§ 1 *et seq.*, the National Parks Omnibus Management Act of 1998, 16 U.S.C. §§ 5901-6011, and implementing NPS regulations set forth in 36 C.F.R. Part 51.

3.      The federal government has waived sovereign immunity for such actions pursuant to 5 U.S.C. § 702 insofar as (1) the claims are not for money damages; (2) an adequate remedy for the claims is not available elsewhere; and (3) the claims do not seek relief expressly or impliedly forbidden by another statute.

4.      The Defendants' actions are reviewable under the 5 U.S.C. § 704 because the terms of the concession contracts have been released as final.  NPS has already made an award (pending Congressional approval) for one of the concession contracts to Delaware North.  NPS has released the prospectus for the other contract and, although Plaintiff repeatedly has raised its objections with NPS in discussions and in correspondence, NPS has refused to adequately address the critical issues brought before it.  There are no other administrative avenues to pursue and no formal administrative remedies for Plaintiff to exhaust.  Thus, NPS has taken final agency action, and Plaintiff has no other recourse but to seek relief in federal district court under the APA.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e) because a substantial part of the events and omissions giving rise to the claims listed below occurred and will continue to occur in Colorado; NPS's Regional Office for the Intermountain Region, which is responsible for park management and program implementation at Grand Canyon National Park, is located in Colorado; Defendant Sue Masica, the Regional Director of NPS's Intermountain Regional Office, resides in Colorado; and plaintiff Xanterra is a Delaware company with its principal place of business in Colorado.

## THE PARTIES

6.      Xanterra is a Delaware limited liability company with its headquarters at 6312 Fiddlers Green Circle, Suite 600 North, Greenwood Village, Colorado 80111.  Xanterra is a special purpose entity whose sole business is operating concessions at Grand Canyon National Park.  Xanterra's predecessor started as the Fred Harvey Company.  Established in 1876, the Fred Harvey Company was the premier hospitality provider of its time, and an industry pioneer in providing quality lodging, food, and services for travelers in the mid-western and western United States.  Since then, Xanterra has remained dedicated to continuing the Fred Harvey Company's legacy of hospitality leadership that spans more than a century.  Xanterra and its predecessor companies have operated park lodges and other facilities at Grand Canyon National Park for 110 years.  During this time, they have designed, funded and built hundreds of buildings including numerous landmarks and other notable attractions such as El Tovar Hotel, Hopi House, Hermits Rest, Desert View Watchtower, Bright Angel Lodge, Phantom Ranch, Lookout Studio, the Mule Barn, Livery Barn, Blacksmith's Shop, Colter Hall, Shirley Hall, Victor Hall, Brown Building, and close to 300 other structures.  Xanterra is committed to operating ecologically

sound resorts that complement their natural surroundings, and has been recognized with numerous NPS and Department of the Interior ("DOI") sustainability and Environmental Achievement Awards throughout the years.

7.      NPS is a bureau of the Department of Interior, with its headquarters located at 1849 C Street NW, Washington, DC 20240.  NPS is separated into seven regional offices across the United States, including the Intermountain Region with offices located at 12795 Alameda Parkway, Denver, CO 80225.  NPS and its regional offices are responsible for the care and maintenance of over 400 National Parks and other locations.  Each regional office has the authority to enter into concession contracts with private businesses to provide food, lodging, tours, and other recreational activities within the national parks.  The Intermountain Regional office of NPS is responsible for Grand Canyon National Park and contracts for services in the Park.  NPS and DOI acted and are acting through their officials.  These officials include Sally Jewell, Secretary of the Interior; Jonathan Jarvis, Director of NPS; and Sue Masica, Regional Director of the Intermountain Region of NPS.

## STATEMENT OF LAW AND FACTS

8.      NPS has seriously mishandled competitive solicitations for new concession contracts to provide lodging and other services to visitors of the South Rim of Grand Canyon National Park.  NPS's arbitrary and capricious conduct extends to two concession contracts, one of which has been awarded pending Congressional approval and the other for which bidding will soon close.  Both contracts include activities that Xanterra currently is performing as the incumbent concessioner.

9.     On August 6, 2014, NPS announced its proposed selection of another contractor, DNC Parks & Resorts at Grand Canyon, Inc. ("Delaware North"), as the awardee (pending Congressional approval) on the smaller of the two contracts (the "smaller contract" or the "003 Contract").  NPS is currently soliciting proposals on the larger of the two contracts (the "larger contract" or the "001 Contract") with bids due October 8, 2014.

10.     This Court should enjoin NPS from taking further action with respect to both concession contracts because NPS's actions violate the law and are arbitrary and capricious in multiple respects.  NPS should be enjoined from proceeding with the 001 Contract because NPS has structured the 001 Contract to deny the concession contractor its statutorily-mandated opportunity to make a net profit, and has failed to address an arbitrary misallocation of the essential employee housing between the 001 Contract and the 003 Contract, making performance untenable under the 001 Contract.  The availability of this employee housing is so fundamental to the economics and feasibility of performance of the larger contract, potential offerors cannot reasonably be expected to enter into a binding contract with the hope that the issue *might* be resolved sometime after award.  NPS should be enjoined from finalizing award of the 003 Contract because the arbitrary misallocation of employee housing provides Delaware North, the tentative awardee, with a surplus of essential employee housing and bestows on Delaware North an unfair competitive advantage in the competition for the larger 001 Contract.  The underlying misallocation of housing cannot be adequately remedied if the 003 Contract is allowed to proceed.

**Laws Pertaining to NPS and Concession Contracts.**

11.     A comprehensive set of laws and regulations governs the award of concession contracts to private companies to operate facilities within the national parks.  NPS has failed to comply with these laws and regulations in its efforts to award new concession contracts at the South Rim of Grand Canyon National Park.

12.     NPS was created in 1916 to "promote and regulate the use of the Federal areas known as national parks."  NPS Act, 16 U.S.C. § 1.  Congress charged NPS to "conserve the scenery and the natural and historic objects and the wild life therein" and "provide for [park] enjoyment [in a way that] will leave them unimpaired for the enjoyment of future generations." *Id.*

13.     In order to accomplish this purpose, Congress authorized NPS to "grant privileges, leases and permits . . . for the use of land for the accommodation of park visitors" and specified that these concession contracts "may provide for the maintenance and repair of Government improvements by the [concessioner]." *Id.* § 3.

14.     Through the use of concession contracts, NPS "provide[s] commercial visitor services that are necessary and appropriate for public use and enjoyment," and that are "consistent to the highest practicable degree with the preservation and conservation of resources and values of the park unit."  NPS MANAGEMENT POLICIES 2006, *Chapter 10, Commercial Visitor Services*, http://www.nature.nps.gov/water/policies/assets/docs/NPS_Management_ Policies_2006.pdf (last visited Sept. 30, 2014). *See also* 36 C.F.R. §§ 51.17.

15.     NPS currently holds concession contracts with more than 600 private businesses in over 100 national parks across the United States.  These contracts gross over $1 billion in

revenue each year and provide jobs for almost 26,000 people.  *See* NATIONAL PARK SERVICE, *About Us*, http://www.nps.gov/aboutus/doingbusinesswithus.htm (last visited Sept. 30, 2014); *see also* U.S. DEPARTMENT OF THE INTERIOR, AGENCY FINANCIAL REPORT, FY 2012.

16.     The National Parks Omnibus Management Act of 1998, 16 U.S.C. §§ 5901-6011 (2012) (the "1998 Act"), provides the current legislative authority for the solicitation, award, and administration of NPS concession contracts.  The purpose of the 1998 Act is to "mak[e] the NPS concession management program more efficient and enhanc[e] competition in NPS concession contracting." National Park Service Concession Contracts, Final Rule, 65 Fed. Reg. 20,630 (April 17, 2000).  *See also* 16 U.S.C. § 5952; 36 C.F.R. Part 51.

17.     Under the 1998 Act, "[a]ll proposed concessions contracts shall be awarded by the Secretary to the person, corporation, or other entity submitting the best proposal, as determined by the Secretary through a competitive selection process." 16 U.S.C. § 5952(1).  The competitive process for awarding concession contracts requires publication of a "prospectus" outlining the contract requirements and contemplated business terms and conditions.  *See* 36 C.F.R. §§ 51.4 to 51.12 (detailing solicitation, selection and award procedures).

18.     NPS is also prohibited from designing prospectus terms to fit a particular concessioner, thereby affording that concessioner an unfair competitive advantage.  In response to the question "[w]ill a concession contract be developed for a particular potential offeror?" NPS regulations provide: "[t]he terms and conditions of a concession contract . . . must not be developed to accommodate the capabilities or limitations of any potential offeror." *Id.* § 51.6.

### A "Reasonable Opportunity for Net Profit"

19.     The 1998 Act requires that franchise fees levied by NPS under concession contracts **shall** grant the concessioner a "reasonable opportunity for net profit in relation to capital invested and the obligations of the contract." 16 U.S.C. § 5956(a) (emphasis added). Franchise fees are mandatory payments to the government by a concessioner at an amount determined in the contract. *Id.* § 5956(b).

20.     The obligation to ensure concession contractors have a "reasonable opportunity for net profit" is well-established law.  For example, the 1998 Act created a NPS Concessions Management Advisory Board and tasked it with advising on "[p]olicies and procedures intended to assure that services and facilities provided by concessioners are necessary and appropriate, meet acceptable standards at reasonable rates with a minimum of impact on park resources and values, and provide the concessioners with a reasonable opportunity to make a profit." *Id.* § 5958.

21.     The requirement to afford concessioners a "reasonable opportunity to make a profit" is safeguarded by NPS's own regulations implementing the 1998 Act.  In addition to the statutory requirement to provide concessioners with a "reasonable opportunity for net profit," the regulations obligate NPS to assess "the probable value to the concessioner of the privileges granted by the contract involved."  36 C.F.R. § 51.78.

22.     In anticipation of a competitive solicitation, NPS prepares a prospectus to inform all potential concessioners of the upcoming contract requirements.  The prospectus must disclose all material terms of the contemplated concession contract and inform prospective bidders of the

economics as deemed "necessary to allow for the submission of competitive proposals."   16 U.S.C. § 5952.

23.     NPS is statutorily obligated to prepare a prospectus that accurately and completely outlines its requirements, and to ensure that concessioners have a reasonable opportunity to make a net profit.   In managing the current contract renewal process at Grand Canyon South Rim, NPS has failed to meet either of these requirements.

24.     Whether a "reasonable opportunity for net profit" exists turns on many considerations.   Principal among them is the specified *minimum* franchise fee payable to NPS, which represents an "off-the-top" fixed percentage cut of the gross receipts that the concessioner collects from operating the park facilities.   16 U.S.C. §§ 5952, 5956.   The fee generally applies to all receipts, including those for providing food, lodging, and every other service for which park visitors pay.   Since the concession fee is taken off-the-top, it *is not* a percentage of net profit. The concessioner therefore is at risk of owing a large sum of money to NPS even if it operates at a loss.   The minimum franchise fee payable to NPS is one of the most critical factors in determining whether the concessioner can make a net profit.

25.     NPS also requires capital improvements which are a significant factor in the economics of concession contracts.   For example, most prospectuses specify that the concessioner must construct or improve permanent structures on national park land, such as guest lodging or employee housing facilities.   16 U.S.C. § 5952; *see also id.* § 5954.   Many existing structures are national historic landmarks or historic places that require considerable preservation efforts.   NATIONAL PARK SERVICE, *National Historic Landmarks Located in National Park Units,* http://www.nps.gov/nhl/find/nhlsinparks.htm (last visited Sept. 29, 2014).

26.    The 1998 Act protects concessioner investments by recognizing a concessioner's Leasehold Surrender Interest ("LSI") in any capital improvements the concessioner makes on national park land.  16 U.S.C. § 5954(a).  The LSI takes into account not only the amount of the capital investment by the concessioner but also inflation, deflation and the physical depreciation of the capital improvements over the term of the concession contract.  *Id.* § 5954(a)(3).  If the concessioner's contract is not renewed, NPS is required to pay the outgoing concessioner the cumulative LSI upon expiration of the concessioner's contract.  36 C.F.R. § 51.61.  This LSI typically, but not always, is paid by the incoming concession contractor.

27.    The LSI is a significant economic consideration for both an incumbent contractor and those seeking to replace the incumbent contractor.  When a new contractor enters, the incumbent must transfer all of its LSI to the follow-on contractor, resulting in a forced sale of its investment.  This investment can be considerable in the case of an incumbent like Xanterra, which has invested in the South Rim for 110 years.  Although not expressly contemplated by the 1998 Act, NPS also has taken extraordinary steps to "buy down" or reduce the outstanding balance of LSI associated with a particular park to relieve the incoming contractor of some portion of this obligation.

28.    Most important economic aspects of concession contracts are tightly controlled by NPS.  In addition to setting the minimum franchise fees paid by the concessioner, NPS may also (a) limit the rates (or adjust the rates) paid by park visitors for lodging, food and other services; and (b) establish policies that have an impact on the concessioner's cost to provide services, such as by specifying minimum employee compensation, minimum requirements for the amount and quality of employee housing, and benefits the concessioner must provide.  Virtually every

element of a concession contractor's revenue and numerous aspects of its cost structure are controlled by NPS, making the concessioner particularly vulnerable to actions taken by NPS.

29.    As a result, throughout the life of the contract, NPS can make changes that cap revenues and increase costs to the point that there is no profit.  All of these risks inherent to concession contracts must be taken into account by a potential concessioner in determining their potential profit and how high a fee on gross revenues it can afford to risk.  These factors, and many other risks such as government action like sequestration that can temporarily close the Park, cannot possibly be accounted for in the financial model NPS used to establish the 14% franchise fee.

**NPS Grand Canyon Concession Contract Competition**

30.    Xanterra currently holds one of two existing primary concession contracts for operation of facilities at Grand Canyon's South Rim.  Located approximately 250 miles north of Phoenix, Arizona, the South Rim is a popular destination for many travelers visiting Grand Canyon.  The South Rim is open to the public year-round, though some lodges, restaurants, and gift shops operate only seasonally.

31.    Xanterra is the incumbent concessioner under Concession Contract Number CC-GRCA001-02 ("Xanterra's Existing Contract"), which is the larger of the two existing primary concession contracts at the South Rim.  Xanterra's Existing Contract involves operating over 300 buildings, including El Tovar Hotel, Phantom Ranch, Bright Angel Lodge and Cabins, Maswik Lodge and Cabins, Yavapai Lodge, Hopi House, Kachina and Thunderbird Lodges, and numerous other lodging options, gift shops, and dining facilities.  All staffing and maintenance activities for these facilities are governed by the terms of Xanterra's Existing Contract.  Awarded

for a ten-year term beginning in 2002, Xanterra's Existing Contract has been extended three times, on a year-to-year basis, with the current and final extension expiring on December 31, 2014.

32.     The second incumbent primary concessioner at the South Rim is Delaware North. Delaware North holds the smaller of the two primary concession contracts, Concession Contract Number CC-GRCA003-97 ("Delaware North's Existing Contract"), which involves operation of two general stores.

33.     Delaware North's Existing Contract also expires on December 31, 2014.

34.     NPS solicited competitive bids for the award of two new primary Grand Canyon South Rim concession contracts in August 2013.   Through the Intermountain Regional Office, NPS initially issued two prospectuses for the contracts: CC-GRCA001-15 (the "001 Prospectus") and CC-GRCA003-15 (the "003 Prospectus").   The smaller 003 Contract is set to begin January 1, 2015, coinciding with the end dates of the Existing Contracts, while the larger 001 Contract will not begin until February 1, 2015.

35.     The Prospectuses announced NPS's desire to significantly change the way in which operations are divided between the Existing Contracts, and transferred responsibility for operating a portion of the Park visitor lodging facilities and other service activities that currently fall under Xanterra's Existing Contract to the 003 Contract.

36.     While both Prospectuses were initially made public in August 2013, only the 003 Prospectus proposal period closed as planned on November 25, 2013.   The 001 Prospectus, currently in its third version, has undergone numerous amendments and significant changes and is set to close to bids on October 8, 2014.

**NPS's Arbitrary and Capricious Allocation of Employee Housing and Facilities**

37.     In addition to the egregious 14% franchise fee, of central significance to this case is NPS's control over what existing housing at the Park will be available to the concessioner's employees who work and live at the Park.  The availability of suitable employee housing is of critical importance for employee morale and retention and is essential to a concessioner's operations because many national parks are far removed from populated areas.  In the case of the Grand Canyon South Rim where Xanterra operates, the closest town is Tusayan, Arizona, which has very little housing.  The closest areas with any significant amount of housing are Williams, Arizona, which is sixty miles away, and Flagstaff, Arizona, which is over seventy miles away.

38.     Though employee housing located within a park is typically built by the concessioner, or passed on by the outgoing concessioner to the incoming concessioner, NPS retains a high degree of control over all park properties, particularly during the transition period at the end of a concession contract.  *See* 36 C.F.R. §§ 51.52-51.61.  No new in-park facilities can be constructed or expanded without NPS's permission.  36 C.F.R. § 51.54.  Existing residential facilities may have to be demolished or repurposed at NPS's direction.  *See* 36 C.F.R. §§ 51.51, 51.64.  As such, arbitrary decisions with respect to allocation of park housing can have disastrous operational and financial consequences for the concessioner, its employees and ultimately park visitors.

39.     The concessioner's only protections with respect to the use of housing facilities on park property are:  (a) contractual terms that NPS is bound to honor during the term of a concession contract; and (b) the concessioner's right to recover any LSI relating to these facilities once the contract expires (if the concessioner does not win the replacement concession

contract).  When one concession contract ends and another begins, the incumbent concessioner must compete for renewal of its contract and is at the mercy of NPS's determination as to what housing will be made available under the follow-on contract.

40.     As with the Existing Contracts, the 001 and 003 Prospectuses require concessioners to provide adequate and appropriate housing to contract employees at reasonable rates.  However, NPS created a serious employee housing shortage by making radical changes to how housing is allocated between two different concessioners operating simultaneously at the South Rim.

41.     Currently, housing facilities accommodate almost all of the housing requirements for employees for *both* incumbent contractors at the South Rim.  The following chart represents the total number of employees performing under the Existing Contracts, as well as the number of facilities and employee housing (measured by bed count) assigned to each:

|  | Xanterra's Existing Contract | | Delaware North's Existing Contract (Estimated) | |
|---|---|---|---|---|
|  | *Summer* | *Winter* | *Summer* | *Winter* |
| **Buildings in Use** | 313 | 269 | 20 | 20 |
| **Employees Needed** | 1,230 | 1,015 | 75 | <75 |
| **Housing Beds Available** | 1,194 | 1,110 | 71 | 71 |

42.     Due to the seasonal nature of some work under Xanterra's Existing Contract, Xanterra needs to employ 215 additional staff members during the summer months.  Over a third of these seasonal summer employees are assigned to seasonal beds in the non-winterized Maswik Historic Cabins.

43.     Instead of keeping the scope of concessioner responsibilities and activities under the follow-on concession contracts identical or very close to the scope of the Existing Contracts, NPS arbitrarily decided to transfer to the 003 Prospectus responsibilities for operating a portion of the Park visitor lodging facilities and other service activities that currently fall under Xanterra's Existing Contract.   By doing so, NPS, in effect, reduced the scope of the larger concession contract (under the 001 Prospectus) and increased the scope of the smaller concession contract (under the 003 Prospectus).   The following chart represents employees needed and housing and facilities assigned to the 001 and 003 Prospectuses:

|  | 001 Contract | | 003 Contract (Estimated) | |
| --- | --- | --- | --- | --- |
|  | *Summer* | *Winter* | *Summer* | *Winter* |
| **Buildings Proposed for Use** | 241 | 234 | 70 | 53 |
| **Employees Needed** | 1,015 | 1,015 | 265 | <108 |
| **Housing Beds Available** | 931 (deficit of 84) | 791 (deficit of 224) | 352 (surplus of 87) | 352 (surplus of 244) |

44.     When reallocating concession activities under each Prospectus, NPS arbitrarily and capriciously transferred far more housing than is needed for the smaller 003 Contract and left far too little housing than is needed for the larger 001 Contract.   NPS has yet to explain this action which unfairly benefits the awardee of the 003 Contract.

45.     NPS's decision to transfer and re-assign the existing employee housing without giving the slightest consideration to what services, and therefore job positions, will also be transferred, has left a serious shortage of on-site employee housing for the larger contract, which is far more labor intensive than the smaller contract.

46.   Primarily seasonal, summer job positions will be transferred from the existing larger contract to the smaller contract.   Inexplicably, however, the uninsulated, wood-frame Maswik Historic Cabins that have in the past housed these seasonal employees will not be transferred to the smaller contract.   Instead, NPS transferred to the smaller contract housing suitable for year-round use, meaning that in the winter months, the smaller contract will have at least 244 unused beds in habitable buildings.

47.   In contrast, NPS expects year-round concessioner employees under the larger contract to live three to a room in the small, uninsulated Maswik Historic Cabins and the former summer guest cabins known as the "Maswik Quad Cabins" in the dead of winter.   Up to 600 of the 1,000 employees under the larger contract may have to bunk in triple-occupancy rooms over the winter, even though NPS strongly discourages use of crowded and substandard housing at other national park locations.

48.   Generally, the quality of housing transferred to the 003 Contract is superior to the housing that remains for use under the 001 Contract, and the units are more spacious.   They include several single-family homes, and two- and three-bedroom apartments that are currently used to house key managers and their families under Xanterra's Existing Contract.   Under the 001 Prospectus, the only housing available for these managers (or their inexperienced replacements, should the housing situation have the unfortunate effect of driving these tenured employees out of the Park) would be smaller, older, less desirable units that may not accommodate families.   Many of these essential employees have worked and lived with their families in the Park for decades.   Without adequate in-park housing, they will be uprooted from their homes and may choose to find employment elsewhere.

49.     As discussed in Paragraphs 96 and 97 below, on August 8, 2014, NPS reissued a new version of the 001 Prospectus which implicitly acknowledged that NPS may not have allocated sufficient housing to the 001 Contract.  Included in the updated version was the statement that NPS would consider requests for "review of the assignment and allocation of employee housing, and the Service would consider such request as appropriate pursuant to Section 8 of the Draft Contract."  This prompted Xanterra to seek further guidance, prior to the due date for bids, as to what NPS would consider.  A letter from Xanterra to NPS and Delaware North dated September 3, 2014, elicited no written responses.

50.     On September 23, 2014, at Xanterra's request, NPS and Xanterra representatives inspected the available housing and discussed potential ways that NPS might rectify the situation. The capriciousness of NPS's actions and unsympathetic attitude toward the problems created by NPS's arbitrary allocation of housing between the two contracts was confirmed by that visit. Xanterra explained, once again, that as of January 1, 2015, over 200 employees would be displaced from their homes.  Some would lose housing altogether, while other twenty-year Park employees would lose their private rooms and be forced to live double or triple to a small room in dormitory-style housing.  Xanterra also informed NPS representatives that the allocation of employee housing has created uncertainty and fear among Xanterra's employees at the Grand Canyon because they are wondering whether they will lose their housing after January 1, 2015, or be moved to less than acceptable housing.  One NPS suggestion was that those employees could "go to work for Delaware North."  This could be viewed as simply a less than empathetic and flip answer.  However, since Delaware North presumably would not wish to hire an additional 200 employees unless it won the 001 Contract, the response carried with it the

suggestion that NPS planned to award the 001 Contract to Delaware North.  NPS also confirmed that assigning three people to a room and asking six people to use one small bathroom would be fine, although in the past neither NPS nor Xanterra would have considered this to be an acceptable living arrangement for full-time, year-round employees for whom this is their only home.

51.     Xanterra reiterated that the Maswik Cabins—the single-layer wood cabins built on a wood frame, with no insulation or internal wall space to keep them warm and plumbing that would freeze—were not equipped to house year-round occupants.  Xanterra was informed that all one needs in an uninsulated cabin is "a big wood stove and [to] crank up the electric heat."  Xanterra again noted that the occupants would not be temporary campers, but full-time, year-round employees.  Xanterra was told that NPS was looking for a "quick" and "temporary" solution, which completely ignored the fact that the problems will persist for the fifteen year term of the contract.  Irrespective of the statement in the reissued prospectus referenced above, apparently finding a long-term solution by reallocating excess housing from the 003 Contract was no longer considered an option.

52.     Shortly after these discussions, NPS made minor amendments to the prospectus that provided minimal short-term relief and left more fundamental problems unresolved.  NPS agreed to "immediately convert" some of the non-winterized Maswik Quad Cabins for continued use during the next few months of Xanterra's Existing Contract, but it is unclear how these cabins will be improved or when.  NPS announced that *after* award of the 001 Contract, it will consider allowing the awardee to make limited permanent winterizing improvements to Maswik Historic Cabins, which will be a time-consuming and expensive investment given their single-

wall construction and building system problems.   In the meantime, NPS will provide for additional housing *"during only the first year"* of 001 Contract performance.  FEDBIZOPPS.GOV, 001-15B   Amendment   4   (Sept.   30,   2014)   (emphasis   added),   *available   at* https://www.fbo.gov/spg/DOI/NPS/APC-IS/CC-GRCA001-15B/listing.html.   These   quick, temporary fixes are not remotely adequate to solve the serious housing issues in the short or long term.

53.   Under the terms of the 001 and 003 Prospectuses, however, concessioners are *still required* to provide housing to employees at reasonable rates.  If NPS will not provide adequate in-park housing, the 001 concessioner is left to ensure feasible housing options exist elsewhere, which leaves only two possibilities: (1) compensate those employees willing to commute over 120 miles each day from Williams, Arizona or Flagstaff, Arizona, which Xanterra estimates will cost approximately $2.7 million annually; or (2) invest up to $20 million to acquire land and construct off-park housing nearby.   Neither of these options provides the concessioner an opportunity to recover its full investment within the 15-year period of contract performance.

54.   NPS's irrational and arbitrary allocation of housing made it impossible for the concessioner under the larger of the two contracts to make a net profit.

55.   While the housing problem creates one of the largest issues for bidders, it is not the only NPS-created facility problem.  The "Old Laundry Building," a former Fred Harvey Company service building located near the Bright Angel Lodge, is currently assigned to Xanterra's Existing Contract and used by Xanterra to house its maintenance shop and for necessary office space.   The Old Laundry Building is used for essential operations under Xanterra's Existing Contract, but it will not be available for use under the 001 Contract.  Instead,

under the 001 Prospectus, NPS has decided to allow a third party to use the Old Laundry building as a new boating museum and reduced the size of support facilities by 7,739 square feet, creating a severe deficiency in support space available to the concessioner.

### Proposal Revisions and the Ongoing Competitive Solicitations

56.     Proposals were originally due for both Prospectuses on November 25, 2013.

57.     On or before the original proposal deadline, Xanterra and Delaware North submitted proposals for the 003 Prospectus.  Xanterra opted not to submit a proposal in response to the 001 Prospectus because of its inability to make a net profit under the contract.  On the day bidding on the 001 Prospectus was to expire, NPS extended the deadline for proposals for the 001 Prospectus until December 3, 2013.  This extension came after the original deadline of 4:00 p.m. MST had passed, presumably because no potential offerors bid on the solicitation as proposed.

58.     On December 3, 2013, Xanterra submitted a proposal responding to the extended 001 Prospectus solicitation.  However, that proposal was contingent on Xanterra winning the smaller 003 Contract, to which much of the employee housing needed to perform the larger contract had been irrationally and arbitrarily misallocated.  Xanterra told NPS that this contingency "was required due to the manner in which NPS allocated facilities and operations between [the 001 Prospectus] and [the 003 Prospectus]."  Letter from Andrew Todd, Xanterra President & CEO, to NPS Regional Director, (Dec. 3, 2013) (noting that the solicitation contained "approximately a 250-bed shortage of housing under solicitation 001 and a corresponding oversupply of housing under solicitation 003.").

59.     Also on December 3, 2013, Xanterra filed a protest with the Government Accountability Office ("GAO") challenging the unfair terms included in Prospectus 001. Xanterra alleged the overall terms of the solicitation were unreasonable and inconsistent with the 1998 Act and applicable NPS regulations.  Specifically, Xanterra objected to the way in which NPS allocated housing between the 001 Prospectus and the 003 Prospectus, the rate of franchise fees required by NPS, and the structure and calculation of LSI under the Prospectus.  Taken together, Xanterra explained, these factors made it economically infeasible to perform under the contract.

60.     In its response filed with the GAO, NPS asserted that GAO lacked jurisdiction to consider the matter because "concession contracts do not procure goods or services for the benefit of the government, but rather authorize the parties to provide service to park visitors." Letter from Melissa Lackey, Attorney Advisor at DOI to Scott Riback, Deputy Assistant General Counsel at GAO (Dec. 20, 2013).

61.     Nevertheless, NPS's letter to GAO also stated that NPS had cancelled the 001 Prospectus because Xanterra had "raised a number of points that led NPS to believe that it must substantially revise or clarify the prospectus to demonstrate that it has met its statutory requirements . . . to provide prospective Offerors with a reasonable opportunity for net profit in relations to capital invested and the obligations of the contract under the proposed concession contract."  *Id.*  NPS gave notice that it anticipated issuing another prospectus for this opportunity at a later date. FEDBIZOPPS.GOV, *Cancellation of the Solicitation for CC-GRCA001-15* (Dec. 20, 2013), *available at* https://www.fbo.gov/spg/DOI/NPS/APC-IS/CC-GRCA001-15/listing.html.

62.     On March 11, 2014, NPS issued Prospectus GRCA001-15A (the "001-15A Prospectus").  Proposals submitted under this new solicitation were due in May 2014.

63.     NPS issued several amendments over the course of the 001-15A Prospectus period, and again extended the deadline for submissions until July 2014.   In spite of these numerous revisions, NPS failed to address the significant problem of misallocation of employee housing.   Not surprisingly, the proposal period for the 001-15A Prospectus came to a close and, once again, not a single proposal was submitted.

**The Current Status**

64.     On August 6, 2014, NPS announced its selection of Delaware North as the proposed awardee for the 003 Contract to which NPS had over-allocated the available employee housing.

65.     The 1998 Act requires that, prior to final award, NPS afford the U.S. House of Representatives Committee on Resources and the U.S. Senate Committee on Energy and Natural Resources the opportunity to review any proposed concession contract with anticipated gross receipts in excess of $5,000,000 or a duration of more than ten years.  In order to allow ample time for review, the NPS Secretary is prohibited from awarding any such proposed concession contract until at least sixty days after notifying the Committees.  16 U.S.C. § 5952.   On information and belief, the sixty-day review cycle has not begun for the 003 Contract.  Even assuming that this review process has started, it will be some time before the award to Delaware North occurs.

66.     After announcing its selection of Delaware North, NPS released prospectus GRCA001-15B on August 8, 2014 (the "001-15B Prospectus"), the terms of which NPS claims

are "very similar to [the 001-15A Prospectus]." FEDBIZOPPS.GOV, *Presolicitation Notice for CC-GRCA001-15B* (Aug. 7, 2014), *available at* https://www.fbo.gov/spg/DOI/NPS/APC-IS/CC-GRCA001-15B/listing.html.

67.     While NPS suggests that the 001-15B Prospectus is "very similar" to its prior iteration, it is, in fact, drastically different.   The reason:   Introduction of an unreasonable franchise fee, NPS's manipulation of Xanterra's LSI, and its radical "buy down" scheme.

**The "Buy Down"**

68.     As explained above, a concessioner that loses its concession contract to another company may recoup the fair value of its LSI from NPS at the expiration of its contract. 16 U.S.C. § 5954(a).   This payment is typically made by the incoming concessioner, which in effect is buying the out-going contractor's property interest.   The new concessioner, in turn, will enjoy use of the property interest during the term of its contract and recover the remaining balance of its investment in the LSI at the expiration of its contract.

69.     As a result of its century of investment at the South Rim of the Grand Canyon, Xanterra's current LSI in the Park totals $198 million.   Existing Contract, Appendix 1; 001-15 Business Opportunity, at 26.   Xanterra and its predecessors designed, funded, built, and maintained numerous facilities within Grand Canyon National Park, including El Tovar Hotel, Bright Angel Lodge and Cabins, Desert View Watchtower, Phantom Ranch, Lookout Studio, Hopi House, Hermits Rest, Yavapai Lodge, Thunderbird and Kachina Lodges and hundreds more.   These facilities were designed and built in the spirit of conservation, and have provided decades of visitors an opportunity to enjoy the unimpaired natural beauty of Grand Canyon National Park.   Today, these facilities not only provide Park visitors with a place to eat or rest

while taking in the sights, but the facilities themselves have become destinations in their own right—in fact, many have been designated as national historic landmarks or historic places. NATIONAL PARK SERVICE, *National Historic Landmarks Located in National Park Units,* http://www.nps.gov/nhl/find/nhlsinparks.htm (last visited Sept. 30, 2014).

70.     Xanterra's Existing Contract expires on December 31, 2014.  Under NPS's rules for reimbursement of LSI, on that date NPS will incur an immediate liability to pay Xanterra $198 million.

71.     When NPS first announced the follow-on competition for the concession rights at the South Rim of the Grand Canyon, it split Xanterra's Existing Contract into two pieces, transferring $41 million of Xanterra's LSI to the 003 Prospectus/Contract, agreeing to pay down approximately $19 million in LSI, and leaving an LSI balance of approximately $138 million on the 001 Prospectus/Contract.  On information and belief, NPS made this decision at least in part to decrease the amount of Park assets controlled by Xanterra and to facilitate entry of another contractor to perform some of the concession activities currently managed by Xanterra.

72.     Transferring $41 million in LSI to the smaller of the two contracts also necessitated transfer of $41 million in LSI assets to 003 Prospectus/Contract.  NPS transferred these assets, consisting mostly of employee housing and Yavapai Lodge, without giving sufficient consideration to the consequences of its actions.

73.     If the 003 Contract begins as scheduled on January 1, 2015, the new concessioner will be obligated to pay Xanterra $41 million and will take possession of the misallocated housing.  Under NPS's original plan, NPS also would have been obligated to pay Xanterra $157

million (the balance of the $198 million) when Xanterra's Existing Contract expires on December 31, 2014 if Xanterra lost the re-competition for the larger contract.

74.     Under NPS's first version of the 001 Prospectus (001-15), concessioners would have covered a large portion of this obligation.  The 001-15 Prospectus required prospective concessioners to invest in the transfer of $138 million worth of LSI, which would have been subject to an aggressive 2.5% straight-line depreciation rate over the course of a fifteen-year contract.  This was in addition to increasing the minimum franchise fee to 6%.  In response to Xanterra's GAO protest, NPS determined it must substantially revise or clarify many of the requirements in order to provide prospective concessioners with a reasonable opportunity to make a net profit, and cancelled the 001-15 Prospectus.

75.     NPS then issued a second version of the 001 Prospectus (001-15A),  which afforded potential concessioners two options for treating LSI depreciation: (1) concessioners could pay a higher minimum franchise fee rate of 10.0% annually and recognize LSI depreciation using the "regular" method (i.e., increase or decrease LSI value based on the Consumer Price Index minus any depreciation based on the "condition and prospective serviceability" of the improvement); or (2) concessioners could pay a lower minimum franchise fee rate of 5.3% annually and amortize its LSI aggressively, using a straight-line depreciation rate.  Under both of these options, potential concessioners would pay an initial investment of $138 million to acquire the Grand Canyon South Rim LSI, and NPS would still pay Xanterra $19 million to buy down LSI.

76.     NPS received no bids under these terms.  In the final Amendment 6 to the 001-15A Prospectus, NPS eliminated the concessioner's ability to choose its depreciation method, but

instead set the minimum franchise fee at 5.9%. On July 12, 2014, the 001-15A Prospectus bid period closed and, again, NPS received no bids.

77.     After the proposal period for the 001-15A Prospectus came to a close without a single bid, NPS changed its plans and decided to increase its LSI "buy down" associated with the 001 Prospectus/Contract to a total of $100 million—an $81 million hike over the first two versions of the Prospectus. Xanterra did not request or welcome this $100 million buy down of its LSI. On information and belief, NPS acted to reduce the investment contribution required of any incoming 001 concessioner to the remaining $57 million ($198 million total LSI, less the $100 million NPS buy down, less the $41 million paid by the 003 concessioner) solely to motivate companies other than Xanterra to compete for the larger 001 Contract. NPS, in effect, acted to subsidize Xanterra's potential competitors. This is in addition to favoring one of them by misallocating the employee housing.

78.     NPS's ill-conceived plan to "buy down" LSI, however, is not only unlikely to promote more competition; rather, it will have the opposite effect. It skews the economics of the resulting concession contract to the point where no company, not even the incumbent Xanterra, is left with a fair opportunity to make a net profit.

79.     NPS's decision to invest a total of $100 million in NPS assets to "buy down" LSI completely changed the economics for both NPS and potential concessioners. Only $25 million of this $100 million initial buy down investment will be collected from funds associated with Grand Canyon National Park, including concessioner franchise fees. The remainder and vast majority— $75 million—will be funded through "loans" from other NPS units, essentially raiding those funds earmarked for the operation of other national parks. By statute, NPS must

pay back those loans within the term of the 001 Contract. *See* Consolidated Appropriations Act, 2014, P.L. 113-76 (2014) ("Such [loaned] funds may only be used for this purpose to the extent that the benefitting unit anticipated franchise fee receipts over the term of the contract at that unit exceed the amount of funds used to extinguish or reduce liability."). In order to do that, NPS had to drastically raise the minimum franchise fee.

80.    The new minimum franchise fee is set at a usurious 14% of gross receipts, which is more than *three times* the 3.8% franchise fee paid under Xanterra's Existing Contract and is more than *twice* the 5.9% minimum comparable franchise fee under the previous 001-15A Prospectus.

81.    This unreasonable 14% minimum franchise fee will deny the 001 concessioner a reasonable opportunity to make a net profit, but is avoidable as it is driven by the unnecessary requirement to fund NPS's $100 million LSI buy down.

82.    NPS's decision to buy down $100 million in LSI will have an extraordinary and lasting negative impact on Grand Canyon National Park. The severe austerity measures required to pay back this $100 million will have a significant adverse impact on Grand Canyon South Rim employees by, for example, eliminating positions, instituting a hiring freeze, furloughing employees, and reducing the number of seasonal positions. *See* Email from David Uberuaga, Superintendent of Grand Canyon National Park to Grand Canyon National Park Employees regarding "Follow-up: LSI and Concessions Franchise Fees" (Sept. 18, 2014) (informing Grand Canyon employees of likely repercussions of NPS's LSI buy down plan).

83.    NPS's decision to buy down $100 million in LSI will also have a negative impact on other national parks across the United States. For example, NPS anticipates upcoming layoffs

and hiring freezes involving NPS's own employees and drastic reductions in guest services at numerous parks across the nation.  NPS has also announced plans to raise park visitor entrance fees across the board, which could have the cumulative effect of significantly reducing the amount visitors have to spend on food, lodging or other park goods or services.

84.     NPS' decision to buy down LSI is not only unnecessary, but is also exemplary of NPS' irresponsible mismanagement of agency funds.  Rather than choosing to invest in the unnecessary LSI buy down, NPS could invest in park maintenance projects that have been ignored for years.  An investigation conducted by U.S. Senator Tom Coburn reported that this mismanagement has led to $11.5 billion in accumulated maintenance backlog, $405 million of which is related to disrepair and maintenance at Grand Canyon.  SEN. TOM COBURN, *Parked! How Congress' Misplaced Priorities Are Trashing Our National Treasures* (October 2013), *available at* [http://www.coburn.senate.gov/public/index.cfm/](http://www.coburn.senate.gov/public/index.cfm/)*oversightaction.*

### The Current Housing Problem

85.     While implementing such drastic and unnecessary measures, NPS inexplicably failed to address the root cause of another major problem with the Prospectuses:   the misallocation of housing.  The 001-15B Prospectus states that "[i]f the Concessioner identifies additional requirements for employee housing, the Concessioner must meet those needs outside the Park boundary."  001-15 Business Opportunity, at 15.

86.     Instead of solving the housing problem with a reasonable approach, NPS said in the 001-15B Prospectus that its financial model allowed for $500,000 annually to "accommodate higher wages for some staff living outside of the Park."  *Id*.  In other words, NPS's minimum

franchise fee, already set at an unreasonable 14%, would have been even higher had it not taken into consideration higher employee housing costs.

87.     NPS claims that it developed this level of accommodation with the help of an "independent financial consultant," and that it considered things such as "higher wages to be paid to employees who have to live outside of the park and commute." 001-15B Responses to Questions, Question 10. However, the $500,000 cost purportedly accounted for by NPS has no rational relationship to the financial impact NPS's misallocation of housing between the 001 and 003 Contracts will have on prospective concessioners.

88.     Even if it were practical to lease available replacement housing in far off locations such as Flagstaff, Arizona, it would add costs upwards of $1,000 per month, per employee, which translates to $2.7 million annually for the 224 displaced employees.

89.     By Xanterra's estimate, up to $20 million would be required to acquire land and build adequate employee housing adjacent to the Park. In order for a concessioner to make a net profit, it would have to recover the full investment within the term of the 15-year contract. This is not feasible under the terms proposed by NPS. In fact, by Xanterra's estimate, not only would performance under these terms lead to a negative return on investment, but in the best case scenario Xanterra would be operating with a cumulative negative cash flow over the fifteen years of contract performance.

90.     Even if a concessioner were willing to deplete any profit margin it may have had and operate cash-negative in order to pour $20 million into acquiring land and constructing new housing for its employees, it could not finish the housing by February 1, 2015, the revised date for commencement of performance under the 001 Contract.

91.     Moreover, any investment by a concessioner in "off-park" housing would not be recoverable as LSI at the end of the term of the concession contract. *See* 001-15 Business Opportunity, at 26 ("**[T]he Service does not intend to approve construction projects or major rehabilitation projects that would increase the amount of LSI during the term of the [Contract].**") (emphasis in original).   This places a substantial portion of the concessioner's investment at risk, as any private investment in off-park housing will be worthless if NPS again changes its mind and reverses its arbitrary assignment of in-park housing or decides to allow construction of more in-park housing.

92.     Unprotected investments outside the Park also may cause a repeat of similar problems at the end of the new contract.   If NPS's future prospectus terms also necessitate off-park housing, but the 001-15B concessioner fails to secure the follow-on contract, the next winning concessioner will presumably require use of the housing for contract performance and will be faced with the same unattractive options.

93.     NPS's economic models relative to the feasibility of the approach outlined in its Prospectuses cannot adequately account for this "off-park" investment in analyzing whether the concessioner would have a reasonable opportunity for net profit.

94.     Even if NPS's economic models were valid, the $500,000 annual amount offered by NPS also compounds the unfair competitive advantage afforded to Delaware North as the proposed awardee of the 003 Contract.   Because of NPS's misallocation of housing to the 003 Contract, Delaware North will have the surplus of housing needed to perform the 001 Contract. This access to housing will give Delaware North a significant competitive advantage in hiring the highest quality employees, who naturally prefer living inside the Park to the cost and

inconvenience of commuting hundreds of miles each day.  If Delaware North also wins the 001 Contract, it will not have to spend millions of dollars investing in "off-park" housing for 001 employees.   If NPS's financial model in fact accommodates the additional costs to the concessioner for off-park housing, it is unreasonable to extend that benefit to Delaware North, which already enjoys the competitive advantage of surplus in-park housing as a result of NPS's arbitrary and capricious actions.

95.     In response to potential concessioners' requests for an explanation as to how NPS expected concessioners to perform the contract with its employees being relocated outside the Park, NPS responded that "[o]fferors must make their own analysis of housing and staffing needs based on their industry knowledge and best management practices."   001-15B Responses to Questions, Questions 12, 13 and 43.  NPS claimed only that, based on "projections generated by its independent consultant," it "believes the Concessioner will have adequate housing" under the announced plan.  *Id.* at Question 12. It further stated that "if the Concessioner identifies additional requirements for employee housing, the Concessioner must meet those needs outside the Park boundary."  001-15B Business Opportunity, at 15.

96.     Although a reallocation of housing between the 001 and 003 Contracts is one solution that conceivably could solve the housing dilemma, NPS's 001-15B Prospectus only alludes to the possibility of such an allocation at some time in the future.   The 001-15B Prospectus offers potential offerors the opportunity to consult with the Grand Canyon Superintendent regarding their "need for in-park employee housing and the allocation of such housing," and states there may be a need to "appropriately reallocate such housing among

concessioners operating within the Grand Canyon Village. . . ."  Prospectus GRCA001-15B, Operating Plan, Exhibit B to the Draft Contract, § F(14)(c).

97.     The prospectus states that "[e]ither the [potential 001 concessioner] or the concessioner under [the 003 Contract] may request a review of the assignment and allocation of employee housing."  GRCA001-15B business Opportunity at 15.  However, any withdrawal or transfer of assigned facilities would occur only "during the term of this Contract," meaning that a potential 001 concessioner must enter into a contract before knowing if additional housing would be available to it.  001-15B Prospectus, Draft Contract at 10-11; 001-15B Prospectus, Operating Plan, Exhibit B to the Draft Contract, Section F(14)(c).

98.     It is unreasonable, arbitrary and capricious for NPS to expect potential concessioners (with the exception of Delaware North, for which the potential uncertainties are in-hand) to submit binding proposals with such a material term unresolved and without a guaranteed resolution.

99.     NPS's inclusion of this language in Prospectus 001-15B also renders the solicitation impermissibly vague because a post-award negotiation to finalize all material terms and conditions will be required.

100.    NPS's announcement of a possible reallocation of employee housing after proposals for the 003 Contract were submitted also is unreasonable, arbitrary and capricious because a housing reallocation down the line would materially change the economics of both the 003 and 001 Contracts, thereby calling into question the requirements reflected in the 003 Prospectus that led to the selection of Delaware North.  This amounts to an arbitrary and

capricious retroactive amendment of the 003 Prospectus after award which is prejudicial to all others who submitted or might have submitted proposals under the original terms.

101.    On September 3, 2014, Xanterra submitted a letter to Sue Masica, NPS Regional Director for the Intermountain Region, and Jim Houser, Delaware North Chief Operating Officer, urging NPS not to wait until sometime in the future to revise the housing allocations and associated LSI contemplated under the 003 Prospectus and 001-15B Prospectus.  Rather than wait until "during the term of [the 001] contract," Xanterra proposed moving forward with this revision "before the bids on the large contract are due and before housing assignments and employee and family living situations under both contracts are completely (and needlessly) scrambled effective December 31, 2014."  Letter from Andrew N. Todd, President and CEO of Xanterra South Rim, L.L.C. to Sue Masica, Regional Director of NPS and Jim Houser Chief Operating Officer of Delaware North (Sept. 3, 2014).  NPS has yet to respond to Xanterra's request for a rational reallocation of housing between the 001 Contract and the 003 Contract *prior* to the October 8, 2014 deadline for proposals for the larger contract.

102.    On September 3, 2014, Xanterra wrote to NPS Director Jonathan Jarvis to inform him of Xanterra's position as it pertains to Grand Canyon Prospectuses 003 and 001-15B. Xanterra informed Mr. Jarvis that NPS has misallocated employee housing between the two contracts, and that, if the Prospectuses are not amended, the shortage under the 001 Contract will severely affect the employees of any concessioner that is awarded the 001 Contract but not the 003 Contract.  The letter explained the housing shortage situation:

> During the summer season, the shortage under the [001] contract will be approximately 84 beds.  During winter operations, the [001] contract concessioner will have a shortage of approximately 224 beds since the Maswik cabins (now utilized for employee housing) are not winterized.  The [001] contract

> concessioner could be forced to triple up employees in all 56 Maswik cabins, 10 Colter Hall rooms, and 24 Rouzer Hall rooms. This means up to 600 of the 1,000 employees working under the [001] contract could live in triple occupancy rooms for the winter…Furthermore, beyond a simple misallocation by the numbers, NPS assigned generally superior housing to the [003] contract. The [003] contract housing consists of better quality and more spacious units. The [001] contract concessioner will be forced to move dozens of people (including 11 key managers) out of single family homes, and two and three bedroom apartments into smaller, older, less desirable units that may not fit their families, and which may have the unfortunate effect of driving them out of the park and our company.

Letter from Andrew N. Todd to Jon Jarvis (Sept. 3, 2013). Xanterra has not yet received a response to this letter.

103.   The situation is urgent.   All employee housing assigned to the 003 Contract, which includes the 244 beds currently used for employee housing under Xanterra's Existing Contract, will become unavailable on January 1, 2015, when the 003 Contract goes into effect.

104.   NPS's plans adversely impact everyone associated with the Grand Canyon, but perhaps most of all it affects both NPS employees and the concessioner employees because their living conditions and livelihoods are jeopardy.

105.   Serious impacts on the NPS's own employees include NPS's plans to institute a park-wide hiring freeze and eliminate vacant positions, which will likely increase the job requirements of the employees who remain, eliminate or postpone planned work projects, extend employee furloughs, and even eliminate seasonal positions in coming years.   *See* Email from David Uberuaga, Grand Canyon National Park Superintendent, to all Grand Canyon Employees regarding "Follow-up: LSI and Concessions Franchise Fees" (Sept. 18, 2014).

106.   Serious impacts on concessioner employees include a large number of Xanterra employees and their families being left homeless and/or jobless if they (or their employer) cannot make suitable alternative housing arrangements that will enable them to continue to work at the

Park.  This burden will fall disproportionally on long-time employees with families who cannot live in cramped dormitory-style rooms, are unwilling to endure hours-long bus rides going to and from their work at the South Rim, or who cannot afford to maintain two residences—one in cramped quarters at the Park and another for their families in towns far away.

107.    For months, Grand Canyon concessioner employees have been in a state of near panic over the 001 Prospectus housing and employment situation.  Many of these individuals bring with them many years of experience and dedication to Grand Canyon National Park. NPS's plan fails to take into account the livelihoods of these tenured employees and their families.  Rather, it unnecessarily saddles the Park with LSI buy down debt that must be repaid at the employees' expense.

### Inter-relationship of the Two Concession Contracts and Facts Relevant to Injunctive Relief

108.    Because NPS has elected to undertake concession activities at the South Rim under two separate concession contracts, there is no guarantee that a single concessioner will be deemed to provide the best proposal in response to both prospectuses.  And right now, the only potential concessioner who could win both contracts, Delaware North, has a built-in unfair advantage in bidding on the 001-15B Prospectus.

109.    Insofar as employee housing necessary to perform the activities contemplated by the 001 Contract is being reassigned to the 003 Contract, both Prospectuses must be amended to meaningfully address the economic disincentives associated with NPS's current plans to reallocate the employee housing.  If NPS is allowed to enter into a contract with Delaware North pursuant to the 003 Prospectus, that action will effectively preclude NPS from amending the 003 Prospectus to restore the employee housing.

110.    Such a contract award will essentially block use of housing that is necessary for performance under the 001-15B Prospectus because the housing will have been arbitrarily awarded to the 003 Contract concessioner.  While NPS claims it will consider requests for the "review of the assignment and allocation of employee housing," such requests are restricted to being made after award of the 001 Contract and, therefore, provide potential concessioners with no ability to determine whether they can submit a bid that will allow for an opportunity to make a net profit.

111.    If NPS awards the 003 Contract to Delaware North but fails to fix the significant issues with the 001-15B Prospectus, Xanterra may be irreparably harmed because it will lose its opportunity to submit a conforming bid on the 001 Contract.  Xanterra cannot submit a bid in alignment with the 001-15B Prospectus' requirement for an unreasonable 14% minimum franchise fee without knowing whether adequate in-park housing will be available to its employees.  These issues preclude Xanterra's opportunity to make a net profit.

112.    On December 31, 2014, incumbent contractor performance for these services at the Park will expire.  Though performance is set to begin immediately on January 1, 2015 (under NPS prospectus CC-GRCA003-15), the majority of follow-on performance will not begin until February 1, 2015 (under NPS prospectus CC-GRCA001-15).

113.    The status quo can be maintained by extending existing concession contracts. NPS recently issued final rules that grant the agency the ability to negotiate temporary "bridge" contracts, and justifies immediate implementation of these rules as follows:

> [NPS is] facing the possibility that, due to contracting delays, [it] may this year have expiring concession contracts that we have no authority to extend further. This situation could result in closure of visitor facilities at affected parks and thereby deprive park area visitors of needed concession services. Making this rule

> effective immediately upon publication could allow [NPS] to enter into temporary contracts for those expiring contracts without an interruption in visitor services this year. This will keep visitor services open, private sector businesses operating, and avoid employee layoffs.

Concession Contracts, Final Rule, 79 Fed. Reg. 58,261 (September 29, 2014).

114.    The unfair competitive advantage created by NPS's housing misallocation and illusory $500,000 annual subsidy, combined with Xanterra's inability to submit a bid in complete alignment with the 001-15B Prospectus create harm that significantly outweighs any harm NPS will face by maintaining the status quo and resoliciting the 003 and 001 Prospectuses.  In fact, NPS would suffer no harm if it were to maintain the status quo by extending Delaware North's Existing Contract or negotiating with Xanterra to issue a temporary contract, thereby allowing for rational revision of the 001 and 003 Prospectuses.  By doing this, NPS would eliminate the need to hastily enter into the 003 Contract and continue solicitation efforts under the unreasonably flawed 001-15B Prospectus.

115.    Enjoining Defendants from proceeding under the 001-15B Prospectus and the proposed 003 Contract selection of Delaware North is in the public's best interest.  In order to meet the arbitrary terms it proposes for the 001 and 003 Contracts, NPS will institute numerous changes that are to the public's detriment.  The lack of housing for the 001 concessioner will displace numerous employees, destroying years of hard-earned goodwill and threatening the quality of services provided to Grand Canyon visitors.  The LSI buy down will put a financial strain on the other parks in the national park system, causing visitor entry fees to increase and requiring many important improvement projects to be halted.  NPS employees will be released, whereas others will be asked to accept reduced compensation.  Simply requiring Defendants to

revise and re-solicit the Prospectuses will have no adverse impact on the public, and will ensure that Defendants are awarding concession contracts in a competitive manner as required by law.

**COUNT I**
**(Arbitrary, Capricious, and Unlawful Agency Action in**
**Violation of the APA and the 1998 Act's Mandate that Concessioner**
**be Afforded a Reasonable Opportunity to Make a Net Profit)**

116.    Xanterra incorporates the allegations in paragraphs 1 through 115 above.

117.    The National Parks Omnibus Management Act of 1998 mandates that franchise fees charged by the government must provide the concessioner a "reasonable opportunity for net profit in relation to capital invested and the obligations of the contract." 16 U.S.C. § 5956(a).

118.    The Prospectuses introduce changes to the existing requirements for South Rim concessions, arbitrarily allocate existing employee housing, and include an unreasonable 14% franchise fee that is driven by the requirement to fund NPS's ill-considered $100 million LSI buy down.  Any one of these changes will deny the concessioner a "reasonable opportunity for net profit."

119.    The 001-15B Prospectus prepared by NPS is based on invalid and unrealistic financial and economic models that result in an unreasonable minimum franchise fees in violation of the statutory requirement to provide a reasonable opportunity for profit.

120.    NPS arbitrarily failed to consider both the cost and impracticability of the requirement to provide "off-park" employee housing in structuring the requirements and economic assumptions underlying the 001-15B Prospectus.

121.    The overall structure of the 001-15B Prospectus leaves potential concessioners with no reasonable means to adequately project or plan for operating costs and net revenues under the new contract.

122.    NPS failed to consider the impact of its unreasonable terms and irrational structure of the 001-15B Prospectus on potential concessioners' opportunity to make a net profit.

123.    The terms of the 001-15B and 003 Prospectuses regarding the allocation of employee housing, the LSI buy down, increased franchise fee, and Defendants' refusal to clarify material terms of the contracts related to future housing allocations, is an arbitrary and capricious action by the Defendants under the APA, 5 U.S.C. § 706, and are in violation of the 1998 Act and Part 51 of NPS regulations, 36 C.F.R. Part 51, implementing the same, and should be enjoined.

## COUNT II
### (Arbitrary, Capricious, and Unlawful Agency Action in
### Violation of the APA and the 1998 Act's Competitive Selection Process Requirement)

124.    Xanterra incorporates the allegations in paragraphs 1 through 123 above.

125.    A main purpose of the 1998 Act and resulting NPS rules is to enhance competition in contracting by creating a scheme to encourage participation among potential contractors.  The law provides: "[e]xcept as otherwise provided in this section, all proposed concessions contracts shall be awarded by the Secretary to the person, corporation, or other entity submitting the best proposal, as determined by the Secretary through a competitive selection process."  16 U.S.C. § 5952(1).  The NPS regulations further require competition, stating, "[t]he terms and conditions of a concession contract . . . must not be developed to accommodate the capabilities or limitations of any potential offeror."  36 C.F.R. § 51.6.

126.    The terms and conditions of the 003 Prospectus allocate an irrationally disproportionate amount of available on-site Park housing that is necessary to perform the 001 Contract to the awardee of the 003 Contract.  That misallocation is arbitrary and capricious

because the result is that only the awardee of the 003 Contract can bid on and perform the 001 Contract at a reasonable rate of return.  This provides an insurmountable competitive advantage to the 003 Contract awardee.

127.    NPS's attempt to mitigate this unfair competitive advantage by providing $500,000 per year in its financial model to offset costs of housing employees outside of the Park only makes matters worse because not only is the amount inadequate, but it is also available to the awardee of the 003 Contract who already has sufficient housing and therefore can bid more aggressively that its competitors.  This assumed offset is illusory and only compounds the unfair competitive advantage held by the 003 Contract awardee.

128.    By allocating the housing needed for performance of the 001 Contract to the 003 Contract, Defendant has effectively removed the requisite competitive element from the selection process.

129.    The terms of the 001-15B Prospectus issued by NPS are arbitrary and capricious pursuant to the standard set forth in APA, 5 U.S.C. § 706, and in violation and will continue to violate the 1998 Act, 16 U.S.C. § 5952(1), causing Xanterra and others irreparable harm. Defendants should therefore be preliminarily and permanently enjoined from proceeding under the 001-15B Prospectus.

## PRAYER FOR RELIEF

Wherefore, Xanterra requests this Court to:

1.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that:

a)    Defendants' conduct and threatened conduct under the two Prospectuses for Grand Canyon National Park concession contracts deny the concessioner a reasonable

opportunity to make a net profit in violation of the APA, the 1998 Act, and regulations implementing the 1998 Act.

        b)    Defendants' two Prospectuses for Grand Canyon National Park concession contracts unduly restrict competition in violation of the APA, the 1998 Act and regulations implementing the 1998 Act.

        2.    Issue a permanent injunction under 28 U.S.C. § 2202, 5 U.S.C. § 706, and Rule 65 of the Federal Rules of Civil Procedure:

        a)    Enjoining Defendants from proceeding to accept proposals under the 001-15B Prospectus;

        b)    Enjoining Defendants from proceeding to award the 003 Contract to Delaware North; and

        c)    Directing Defendants to modify the Prospectuses to comply with the law prior to awarding new concession contracts for activities at the South Rim of the Grand Canyon.

        3.    Grant Xanterra such further relief as the Court deems appropriate.

Respectfully submitted this 7th day of October, 2014.

HOGAN LOVELLS US LLP

s/ Daniel J. Dunn
Daniel J. Dunn
1200 17th Street, Suite 1500
Denver, Colorado 80202
303.454.2425
303.899.7333 (fax)
dan.dunn@hoganlovells.com

Thomas L. McGovern III
Catherine E. Stetson
555 13th Street, N.W.
Washington, DC 20004

202.637.5784
202.637.5910 (fax)
thomas.mcgovern@hoganlovells.com
cate.stetson@hoganlovells.com

*Counsel for Plaintiff*
*Xanterra South Rim, L.L.C..*

Plaintiff's address:
Xanterra South Rim, L.L.C.
6312 Fiddlers Green Circle
Suite 600 North
Greenwood Village, Colorado 80111
Phone: 303.600.3400
Fax: 303.600.3600